# In the United States District Court
# for the Southern District of Georgia
# Statesboro Division

JUANA EGDA PACHECO MENDOZA,

    Petitioner,

v.

REY DAVID MORENO PASCUAL,

    Respondent.

CV 615-40

### ORDER

Petitioner Juana Egda Pachecho Mendoza ("Petitioner") filed this action alleging the wrongful retention by Respondent Rey David Moreno Pascual ("Respondent") of their son, L.D.M. (D.O.B. 10/15/2006). She seeks the return of L.D.M. from Statesboro, Georgia, the home of the Respondent/Father, to her home in Mexico pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670 ("Hague Convention"). As explained below, Petitioner has proven each part of her prima facie case, and Respondent has failed to carry his burden of proving any affirmative defenses.

## BACKGROUND

Congress implemented the Hague Convention when it passed the International Child Abduction Remedies Act ("ICARA"). 22 U.S.C. § 9003(b) (formerly cited as 42 U.S.C. § 11603(b)). Along with the United States, Mexico is a signatory to the Hague Convention. Hague Convention on Private Int'l Law, Status Table, Convention of 25 October, 1980 on the Civil Aspects of International Child Abduction, http://www.hcch.net.

The purpose of enacting the Hague Convention is to "[e]nsure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1(b).

Here, Petitioner alleges that L.D.M. has been wrongfully retained in the United States. The Hague Convention contemplates an order of return of any child who was habitually residing in one signatory state but wrongfully retained in another. Importantly, the Hague Convention enables this Court to determine only rights under the Hague Convention. This Court is not to decide the merits of the underlying child custody dispute. Chafin v. Chafin, 742 F.3d 934, 936 (11th Cir. 2013). The Hague Convention is a rapid remedy for the "left-behind parent" to return to the status quo before the wrongful retention. Ruiz v. Tenorio, 392 F.3d 1247, 1251 (11th Cir. 2004). The Court is not to become mired in inquiries of who is

the better parent or who occupies the nicer home. That is the role of the courts in the place of the child's habitual residence. See 22 U.S.C. § 9001(b)(4).

No one can say the trial of this case was not thorough. Indeed, although it occurred in an expedited fashion, it did not conclude within the target six weeks, given the fact that multiple motions were handled, a guardian ad litem was engaged, and counsel was appointed to represent the Respondent, whose citizenship in this country is unclear. That is to say, although Respondent is on the losing side of this Hague Convention case, he lost despite being given fair opportunity to make his case. In doing so, some speed paid tribute to much thoroughness.

The bench trial on the merits was held on January 19, and 20, 2016. Both the Petitioner and the Respondent testified at length, with the assistance of a Spanish language interpreter. Additionally, Mr. Josh Tucker ("Mr. Tucker"), the Court-appointed guardian ad litem testified. Finally, the Court spoke with L.D.M. *in camera* in the presence of the interpreter and guardian ad litem.

## FINDINGS OF FACT

During the trial, the parties disputed many facts, including intent. The Court resolves these disputes as set forth below by taking into consideration the credibility of the

witnesses. A recitation of facts as proven by a preponderance of the credible evidence at trial follows.

Petitioner is L.D.M.'s mother. Respondent is his father. Petitioner and Respondent are both citizens of Mexico. Petitioner and Respondent were married in 2003 in Oaxaca, Mexico. They remain married and had three children together. Their first child was born in Mexico in 2004. At some point after marrying Petitioner and before the birth of their first child, Respondent went to the United States. Not long after giving birth to their first child in Mexico, Petitioner joined Respondent in the United States. Their infant child was left with Petitioner's parents in Mexico. Their intent was to make money for their family. On October 15, 2006, Petitioner gave birth to L.D.M. in Statesboro, Georgia. In 2009, while in the United States, Petitioner gave birth to their third child.

In 2010, Petitioner and Respondent jointly agreed that Petitioner would take L.D.M. and his younger sibling to Mexico to reunite with their oldest child and to live in Mexico permanently. Petitioner and Respondent agreed that Respondent would stay behind in the United States for approximately one year to make a little more money to complete payment on their Mexican house before returning to Mexico to live with his family. Respondent never did return.

Petitioner took care of L.D.M. in Mexico—she provided for his needs and she enrolled him in a Mexican school. L.D.M. resided in Mexico from 2010 until March of 2014, with the exception of a six-month visit to see his father in 2012.

In 2012, Petitioner and Respondent jointly agreed that L.D.M. would visit his father in the United States for a limited, but unspecified duration. Both parents understood the visit to be temporary. During the visit, L.D.M. was enrolled in school in the United States, so as not to miss instruction. His father bought him a one-way airline ticket to the United States. After six months of visiting Respondent, L.D.M. was returned to Mexico at the request of his mother.

In 2014, Petitioner and Respondent jointly agreed that L.D.M. would visit his father. Both parents understood the visit would be temporary. Again, there was no agreement as to the length of the stay, but neither parent contemplated it would be permanent. As in 2012, L.D.M. was again enrolled in school in the United States during the 2014 visit. The visit began in March of 2014. L.D.M. was enrolled in the second grade in Statesboro, Georgia. He performed poorly in school. His teachers recommended holding him back and having him repeat the grade.

Throughout his 2014 stay in the United States, Petitioner maintained regular telephone contact with L.D.M. and kept

AO 72A
(Rev. 8/82)

apprised of his school performance. She opposed any attempt to hold him back and in any event wanted his visit terminated so he could start school in Mexico in the fall of 2014.

She first requested that his visit be terminated in the summer of 2014. Respondent refused to return L.D.M. that summer. As a result, Petitioner contacted the Mexican Office of Exterior Relations and began assembling the necessary paperwork and documentation for the return of her child in the early fall of 2014. In the fall of 2014, she also began trying to find a lawyer to help her. She moved from Oaxaca, Mexico to the Federal District of Mexico in part to pursue the return of L.D.M. It took her several months to eventually make contact with her present attorneys. All the while, Petitioner continued to maintain contact with L.D.M. and demand his return. Petitioner filed her Hague Convention Petition in April of 2015, less than one year from the time she began demanding L.D.M.'s return.

After service of the petition and resolution of a temporary restraining order, the Court appointed Statesboro attorney Mr. Josh Tucker as guardian ad litem for L.D.M. Respondent had requested such an appointment and had suggested Mr. Tucker, given his experience in serving as guardian ad litem in many cases, albeit not in any Hague Convention cases. The Court limited Mr. Tucker's role to exploring facts surrounding

Respondent's affirmative defenses that L.D.M. was a mature child whose wishes to remain in the United States should be accepted or considered by the Court and whether returning L.D.M. to Mexico would expose him to grave risk of physical or psychological harm or otherwise place him in an intolerable situation.

As for L.D.M.'s maturity level, L.D.M. was eight years old at the time his mother first demanded his return. He turned nine shortly thereafter. Mr. Tucker interviewed this nine-year old and his Statesboro teachers. Mr. Tucker testified that L.D.M. is a very reserved child who is physically immature. His teachers related to Mr. Tucker that L.D.M. is more than two years behind his age level academically. Before Mr. Tucker could ask about his maturity level or intimate that it was important for purposes of the Hague Convention, L.D.M.'s teachers spontaneously volunteered that he is immature for his age. At school, he plays with younger children, and he has a hard time relating to his classmates.

Mr. Tucker testified that L.D.M. wants to stay in the United States. He understands the proceedings to the extent that he knows each parent wants him to live with that parent. However, he has no appreciation for the considerations relevant in making that determination. He related to Mr. Tucker that: he does not get to go outside as much in Mexico; that dangerous

AO 72A
(Rev. 8/82)

people live in Mexico; and that his mother treats his siblings better than him. L.D.M. also told Mr. Tucker that his mother hit him in the face with a stick. Mr. Tucker found this assertion lacking in credibility.

As for the grave risk inquiry, Mr. Tucker had an understanding that the Federal District of Mexico is more dangerous than Oaxaca. He understood Statesboro to be generally safer than any city in Mexico. He could not equate Mexico with a "war zone" level of risk.

The Court had an opportunity, with the consent of the parties, to interview L.D.M. *in camera*. The Court found L.D.M. to be a polite and sympathetic nine-year old. As L.D.M.'s guardian and teachers have observed, he is significantly less mature than most nine-year old children. He told the Court that his mother often hit him. As the guardian did before, the Court could not find that assertion credible. He said that each time she calls, he forgets to tell her that he wants to remain in the United States because she hits him. He spoke of Mexico as a place where "robbery people" rob kids. The Court was left with the distinct impression that L.D.M. wanted to stay in the United States and was saying whatever he could think of to remain. L.D.M. is in an unenviable position.

The Respondent testified as well. It is clear to the Court that both parents care about their children. He has not been to

Mexico in eleven years and had no firsthand knowledge of what it is like, although he has heard many accounts that it is dangerous. He agreed that when L.D.M. was sent to visit him in 2014, it was not contemplated that L.D.M. would permanently reside in the United States. He has refused to send L.D.M. back because L.D.M. would rather live in the United States. He has made no formal efforts to have his other children leave Mexico to live with him in the United States. He believes his wife lives in the Federal District of Mexico because it gives her more freedom. He recorded a recent conversation with his wife in which she said the Federal District of Mexico is dangerous and that a shooting occurred near her home. He believes almost all of Mexico is very dangerous.

## CONCLUSIONS OF LAW

The Petitioner has the burden of proving, by a preponderance of the evidence, a prima facie case for return. Those elements include proof that: (1) the child is under the age of sixteen; (2) the child was wrongfully retained; (3) he was retained from his habitual residence; (4) the retention amounts to a breach of custody rights under the laws of the child's habitual residence; and (5) the Petitioner was exercising these custody rights. Hague Convention, art. 3; 22 U.S.C. § 9003(e)(1)(A).

First, it is undisputed that L.D.M. is well under sixteen years of age. Second, the Petitioner has clearly carried her burden in establishing that L.D.M. was wrongfully retained. The Hague Convention provides a one-year time-period for a parent to commence proceedings for the return of a child after a wrongful retention. Here, it is clear that the 2014 visit was not to be permanent. When Petitioner requested L.D.M.'s return in 2014, Respondent refused. Petitioner filed her Petition well within the one-year limit.

Third, it is clear that as of March, 2014, when L.D.M. visited the United States, Oaxaca, Mexico, was his habitual residence. He had lived in Mexico since 2010. When he came to Mexico in 2010, it was with the understanding of both parents that L.D.M. would live permanently in Mexico. He went to school in Mexico and exhibited all the indicia of habitually residing there. When he came to Statesboro in 2014, his habitual residence did not change. Neither the Hague Convention nor ICARA defines "habitual residency." Ruiz, 392 F.3d at 1252. Case law has developed that requires the Court to first determine whether there has been a settled intention to abandon a prior habitual residence (in this case Mexico) to have the child inhabit a new one (in this case Statesboro, Georgia). Id. (following Mozes v. Mozes, 239 F.3d 1067, 1074 (9th Cir. 2001)). This case presents the scenario where the exact length of the

Statesboro visit was not agreed upon, but there certainly was no agreement to abandon Mexico as the residence of L.D.M. Petitioner unequivocally never agreed to such a change. Not only was there no shared settled intent on the part of the parents to abandon L.D.M.'s Mexican residence, the Court cannot "say with confidence" that L.D.M.'s relative attachments to Mexico and the United States have changed to the point where requiring a return to Mexico would be the equivalent of taking him out of the "family and social environment in which his life has developed." Ruiz, 392 F.3d at 1254 (quoting Pérez-Vera Report[1] at ¶ 11). That is to say, in looking at all of the relevant objective facts, including his maintenance of contact with his mother in Mexico, the amount of time he has spent in Statesboro, L.D.M.'s poor performance in school, his language difficulties, and his overall social development, the Court finds that L.D.M. is neither sufficiently settled nor acclimatized in the United States and that Mexico remains L.D.M.'s habitual residence.

Fourth, the Petitioner has proven that Respondent's retention of L.D.M. in Statesboro is a breach of Petitioner's

---

[1] Elisa Pérez-Vera, Explanatory Report, in 3 Actes et Documents de la Quatorzième session (1982) ["Pérez-Vera Report"]. The Pérez-Vera Report is "'recognized by the Conference as the official history and commentary on the [Hague] Convention and is a source of background on the meaning of the provisions of the [Hague] Convention available to all states becoming parties to it.'" Ruiz, 932 F.3d at 1251, n.2 (citing Shalit v. Coppe, 182 F.3d 1124, 1127-28 (9th Cir. 1999) (internal quotations and citations omitted)).

custody rights under the laws of L.D.M.'s habitual residence - Oaxaca, Mexico.

Petitioner provided adequate documentation that the law of *patria potestas* applies in the state of Oaxaca, Mexico. See Pet.'s Ex. 17. Specifically, the Civil Code for the State of Oaxaca, Articles 427 and 428, make it clear that the mother and father of a child have mutual authority and responsibility to care for and exert control over minor children. Dkt. No. 60, p. 3. Article 429 makes it clear that when a mother and father live in separate places and disagree as to which parent will have custody, a (Mexican) Judge will decide custody. Id. at pp. 3-4. No evidence of any such Mexican decree infringing on Petitioner's custodial rights was introduced.

To ensure that Petitioner's submission of Mexican law was correct, the undersigned utilized the International Hague Network of Judges to request information concerning the law of custody rights in the foreign jurisdiction. Id. at pp. 1-2. The Network Judge confirmed the law as submitted by Petitioner is in fact the law of Oaxaca, Mexico.

Finally, Petitioner was clearly exercising custody rights at the time of the retention. She was actively involved and interested in all aspects of L.D.M.'s life. She never consented to his remaining in the United States permanently and demanded

his return in the summer of 2014. She has aggressively pursued that return since the summer of 2014.

Respondent has not proven any of the recognized affirmative defenses. The Hague Convention sets forth five defenses that may be raised in proceedings for the return of a child. ICARA sets forth the burdens of proof. Respondent asserts two of these defenses: "consent" and "grave risk."

In the consent defense, a respondent alleges that a petitioner has consented to or acquiesced in the retention. The burden is on a respondent to prove that defense by a preponderance of the evidence.

The grave risk defense must be proven by the respondent by clear and convincing evidence. To prevail, it must be shown that return of the child to its habitual residence would expose the child to a grave risk of harm or place the child in an intolerable situation.

In addition to these defenses, Article 13 of the Hague Convention contains an unnumbered paragraph providing an additional basis for refusing return: the objection to return by a "mature child." The respondent must prove that defense by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(b). These defenses are generally to be interpreted in a restrictive fashion. Pérez-Vera Report, n. 19, ¶ 34; see also Baran v. Beaty, 526 F.3d 1340, 1345 (11th Cir. 2008).

Respondent has failed to prove the consent defense by a preponderance of the evidence. To the contrary, the credible evidence showed that Petitioner, at all relevant times, was exercising her custody rights. She never consented or acquiesced to L.D.M. remaining in the United States after the summer of 2014. She, in particular, had every reason to believe that her desire for the visit to be temporary would be honored. The 2014 visit was structured in very similar fashion to the 2012 visit which was of limited duration. She has exercised her custody rights to the best of her abilities.

Likewise, Respondent has failed to prove by clear and convincing evidence that returning L.D.M. to Mexico would create a grave risk that he would be exposed to physical or psychological harm or otherwise place him in an intolerable situation. The term "grave risk" means "more than a serious risk." Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002). Such cases include sending a child into a war zone, national famine, epidemic disease condition or serious case of abuse. See Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001). In this case, the record includes anecdotal evidence that areas of Mexico, especially the Federal District of Mexico, are dangerous due to crime. Although no actual facts and statistics were introduced, testimony was presented that Statesboro is safer than Oaxaca, and Oaxaca is safer than the Federal District of

Mexico. There was no credible testimony that the Federal District of Mexico was like a war zone. As the guardian ad litem explained, such crime was akin to intercity areas in this country, but not tantamount to a war zone. Nor was there credible evidence that Petitioner will hit L.D.M. with a stick or otherwise.

Finally, Respondent has failed to prove the mature child defense by a preponderance of the evidence. Article 13 of the Hague Convention recognizes that a child may object to being returned and the Court may refuse return if it is found that the child has attained an age and degree of maturity at which it is appropriate to take into account his views. Fundamentally this defense fails in the present case because L.D.M. is not sufficiently mature. Such inquiry is, understandably, fact intensive and was one of the reasons the Court met with L.D.M. and utilized a guardian ad litem to do the same. Not surprisingly, there are reported decisions finding some eight-year old children sufficiently mature, see Bonilla-Ruiz v. Bonilla, No. 255772, 2004 WL 2883247, at *4 (Mich. Ct. App. Dec. 14, 2004), while others find a nine-year old too immature. See Tahan v. Duquette, 613 A.2d 486, 490 (N.J. Super. Ct. App. Div. Sept. 18, 1992)). Regardless of the maturity level of other nine-year old children, L.D.M., in particular, is immature for his age in discernable ways. Based on the guardian ad litem's

AO 72A
(Rev. 8/82)

investigation and on the Court's own interview of L.D.M., he is not mature enough for the Court to take into account his wishes as a part of this proceeding. To the contrary, the evidence showed that given his maturity level, he tends to shape his words to please his father.

**CONCLUSION**

There certainly is no joy in family discord cases, even ones involving the limited focus required by the Hague Convention. They are obviously difficult for the parents and acutely agonizing for the child. One bright spot is found in the attorneys who participated in this case. Occasionally, Courts point out deficiencies in attorney performance. Here there is cause to do the opposite. All the attorneys representing each side are acting pro-bono. They provided outstanding service to their clients and in so doing, to our profession.

After careful consideration of the facts and law set forth above, it is clear that Petitioner has met her burden of proving her prima facie case for return, and Respondent was unable to carry his burden of establishing any affirmative defense. A separate Order setting forth the details of the return issued on January 20, 2016.

**SO ORDERED**, this 26TH day of January, 2016.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA